IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| TERRA L. MCKEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14CV833 |
| | ) | |
| CITY OF GREENSBORO, NORTH | ) | |
| CAROLINA | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION, ORDER AND RECOMMENDATION

This matter is before the Court on Defendant's Motion for Summary Judgment [Doc. #28]. Plaintiff brings this action alleging racial discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2 & 2000e-3. For the reasons set forth below, the Court will recommend that Defendant's Motion be granted and that this case be dismissed.

I. BACKGROUND

In February 2013, the City of Greensboro ("the City") hired Plaintiff as a crime analyst in the Crime Analysis Unit ("CAU" or "Unit") of the Greensboro Police Department ("GPD"). The CAU is tasked with researching, compiling, and analyzing crime statistics. Plaintiff, a black female, was one of four crime analysts in the CAU. When she was initially hired, Plaintiff was subject to a probationary period, during which time the City could terminate her without adhering to the administrative process required for permanent employees. Four months after she was hired, in June 2013, Plaintiff applied for an open CAU

supervisor position and was granted an interview but ultimately was not hired for that position. In July 2013, five months after she initially was hired, Plaintiff received a performance appraisal of "marginal performance." Plaintiff contends that she was surprised by the negative aspects of the evaluation and did not believe they were justified, having only received positive feedback regarding her work performance prior to the review. Following the review, the probationary period was extended for 90 days, until October 2013. She received an additional review in October 2013, noting various shortcomings. She was offered additional training, and her probationary period was extended to January 2014. Plaintiff filed formal complaints with the City's Human Resources Department, complaining that the shortcomings noted in her performance reviews were unjustified and amounted to harassment. Plaintiff's supervisor met with her in November and December regarding her progress. In December 2013, while still employed, Plaintiff filed a charge of discrimination with the EEOC. In January 2014, Plaintiff was informed that her probationary period would not be extended, and she was terminated. Plaintiff contends that her negative performance reviews, extended probationary period, and ultimate termination were the result of racial discrimination and harassment. The Court sets out below in detail the evidence in the record regarding Plaintiff's claims.

When Plaintiff was hired, the acting supervisor of the CAU was Justin Flynt, who reported to Dr. Lee Hunt, the manager of the GPD's Information Services Division. (Flynt Aff. [Doc. #29-1] ¶ 2; Hunt Aff. [Doc. #29-2] ¶ 1.)[1] Alex Sinykin, a white male, was hired as a crime analyst at the same time as Plaintiff. (Flynt Aff. ¶ 4; Hunt Aff. ¶ 4.) Dr. Hunt and

---

[1] Justin Flynt was a Corporal in early 2013 and was promoted to Sergeant in later 2013. For the sake of consistency, the Court will refer to him throughout as "Cpl. Flynt."

Cpl. Flynt, both white males, served on the panel that hired Plaintiff and Mr. Sinykin. (Flynt Aff. ¶¶ 1-3; Hunt Aff. ¶ 4.) Both Plaintiff and Mr. Sinykin completed the "training checklist" for new CAU employees. (Hunt Aff. ¶ 7.)

Dr. Hunt and Cpl. Flynt have submitted affidavits, asserting that in the months following the initial training, they felt Mr. Sinykin was progressing more quickly in the job than Plaintiff. (Id.; Flynt Aff. ¶ 5.) Nevertheless, in Plaintiff's First Quarter Employment Review, dated June 5, 2013, Dr. Hunt noted no deficiencies in her performance and stated that her "training and skills are where they should be . . . ." (Pl.'s Resp., Ex. 23 [Doc. #35-24] at 1; Def.'s Br., Ex. 1 [Doc. #29-4] at 1.) In his Affidavit, Dr. Hunt states that "Ms. McKee's training and skills were where they should be three months into her employment [and] [a]lthough she had not progressed as much as Alex Sinykin, I did not regard her performance as being deficient, given that she had only been on the job for three months." (Hunt. Aff. ¶ 8.)

Shortly thereafter, in June 2013, Plaintiff applied for the open CAU supervisor position. (Hunt Aff. ¶ 12; Pl.'s Resp., Ex. 29.) Prior to applying, Plaintiff inquired of Dr. Hunt whether she could apply for this position, and he informed her that she could submit an application. In his affidavit, Dr. Hunt states that Plaintiff met the minimum requirements for the supervisor position, and that in any event his permission was unnecessary, so he informed her that she could apply. (Hunt Aff. ¶ 12.) Dr. Hunt oversaw the hiring process for the supervisor position. (Id. ¶ 13.) Out of twenty applicants, Plaintiff was one of six finalists selected for an in-person interview. (Id. ¶¶ 13-14; Def.'s Br., Ex. 7.) Plaintiff was subsequently interviewed on August 16, 2013. (Hunt Aff. ¶ 14.) The interview panel, which included Dr. Hunt,

3

consisted of two black males, one white female, and one white male. (Id.) Following the interviews, the panel offered the job to Brandon Inscore, a white male, who accepted the position. (Id. ¶¶ 14, 17) According to Dr. Hunt, the panel concluded that Mr. Inscore's experience and technical skill set him apart from the other candidates. (Id. ¶ 14; Def.'s Br., Ex. 7.)

According to Plaintiff, after she applied for the supervisor position, Dr. Hunt began to target her for "harassment, discrimination, and retaliation." (McKee Aff. ¶ 5.) In particular, she states that she was no longer allowed to use headphones while working and that she was given responsibility for a weekly report that required her to work through lunch once each week. (Id.) Plaintiff contends that when she was required to work through lunch, Dr. Hunt would not bring her food, although he did so for the two veteran analysts. (Id.) In addition, Plaintiff contends that she received a performance evaluation that was "falsified," and amounted to harassment by Dr. Hunt and Cpl. Flynt. (Id. ¶¶ 2, 5; Pl.'s Resp. [Doc. #35] at 3.) The performance evaluation at issue was a July 5, 2013 annual performance appraisal. In that appraisal, Plaintiff received a score at the high end of the Level 2 "Marginal Performance" rating, just slightly below Level 3 "Meets Expectations." (Def.'s Br., Ex. 2 at 1; Pl.'s Resp., Ex. 51 at 1; Flynt Aff. ¶ 7.) In the evaluation, Cpl. Flynt noted several strengths of Plaintiff, including her timeliness and her participation in evening events. (Def.'s Br., Ex. 2 at 3; Pl.'s Resp., Ex. 51 at 3.) The evaluation also noted that her "training regime is on sche[d]ule four months into employment." (Def.'s Br., Ex. 2 at 3; Pl.'s Resp., Ex. 51 at 3.) However, with respect to Plaintiff's weaknesses, the evaluation identified Plaintiff's need to increase her understanding of police operations, interact more with coworkers to share knowledge and

4

experience, ask more questions, and further develop necessary job skills. (Def.'s Br., Ex. 2 at 3; Pl.'s Resp., Ex. 51 at 3.) The evaluation set out "suggested ways for improvement," including that she should interact with colleagues and "insert [her]self into discussions related to projects and data needs," and further noted that "the downside of using a headset to listen to music is that one cannot pick up on the conversations in the office and interact." (Def.'s Br., Ex. 2 at 3; Pl.'s Resp., Ex. 51 at 3.) The evaluation also focused on various areas for further training and skill development. (Def.'s Br., Ex. 2 at 3; Pl.'s Resp., Ex. 51 at 3.) In her Affidavit, Plaintiff states that she was surprised by the negative aspects of the evaluation and did not believe they were justified. (McKee Aff. ¶¶ 2-3.) Plaintiff asserts that she had received positive feedback regarding her work performance prior to the review. (Id. ¶¶ 2-3.) Plaintiff contends that her work product was "excellent." (Id. ¶ 2.)

On July 16, 2013, Plaintiff met with Cpl. Flynt and Dr. Hunt to discuss her performance review. (Def.'s Br., Ex. 3 at 1; Pl.'s Br., Ex. 54 at 7; Flynt Aff. ¶ 9.) According to the Memorandum provided to Plaintiff after the meeting, Cpl. Flynt and Dr. Hunt discussed with Plaintiff the specific areas in which Plaintiff needed to improve in order to rise to a Level Three rating of "Meets Expectations." (Def.'s Br., Ex. 3 at 1; Pl.'s Br., Ex. 54 at 7.) At the meeting, Cpl. Flynt, Dr. Hunt, and Plaintiff also discussed the subject of wearing headphones at work. (Def.'s Br., Ex. 3 at 2; Pl.'s Br., Ex. 54 at 8; Flynt Aff. ¶ 10.) According to the Memorandum, Plaintiff stated that wearing headphones allowed her to focus on her work and avoid inappropriate conversations among her coworkers, but Plaintiff was unable to give examples of inappropriate conversations she had overheard. (Def.'s Br., Ex. 3 at 2; Pl.'s Br., Ex. 54 at 8; Flynt Aff. ¶ 11.) According to the Memorandum, Cpl. Flynt requested that going

5

forward, Plaintiff report any inappropriate workplace conversation or behavior to a supervisor. (Def.'s Br., Ex. 3 at 2; Pl.'s Br., Ex. 54 at 8.) In his Affidavit, Cpl. Flynt states that he discouraged Plaintiff from wearing headphones and expressed his concern that doing so would hinder Plaintiff's development by further limiting her interactions with her coworkers. (Flynt Aff. ¶ 10.) While the CAU had no formal policy regarding headphone use, Plaintiff contends that after the July 2013 evaluation, she was not allowed to wear headphones, while other CAU employees were permitted to wear headphones. (McKee Aff. ¶¶ 5, 10.) Subsequently, in October 2013, Brandon Inscore, who had recently assumed the CAU supervisor position, implemented a no-headphone policy for the Unit. (Inscore Aff. ¶ 9; McKee Aff. ¶ 10.)

Following the July 16, 2013 meeting, Cpl. Flynt and Dr. Hunt prepared an Individual Development Plan ("IDP") for Plaintiff, setting forth a list of specific tasks and goals for Plaintiff to accomplish. (Flynt Aff. ¶¶ 12-13; Def.'s Br., Ex. 4; Pl.'s Br., Ex. 54 at 23-27.) The initial IDP period was set for sixty days, beginning on July 16, 2013 and ending on September 15, 2013. (Hunt Aff. ¶ 15; Def.'s Br., Ex. 4; Pl.'s Br., Ex. 54 at 23.) Cpl. Flynt and Dr. Hunt also extended Plaintiff's probationary employment for an additional ninety days to October 15, 2013. (Flynt Aff. ¶ 13; Hunt Aff. ¶ 15.) According to Cpl. Flynt, the extension was designed to give Plaintiff sufficient time to meet the goals set out in her IDP. (Flynt Aff. ¶ 13.) Again, because Plaintiff believed that her work product was "excellent and superior to [her] co-workers," she contends that the IDP was unnecessary. (McKee Aff. ¶¶ 4, 7.)

In his Affidavit, Cpl. Flynt states that Plaintiff failed to meet some of the IDP goals, particularly in that she "continued to use the wrong databases for her source data, which meant that the final product was inaccurate. She still did not check her product for accuracy and

6

consistency. She also was not using the standard symbols which had been developed by the unit . . . ." (Flynt Aff. ¶ 14, 15.) A meeting was set for September 25, 2013 to discuss Plaintiff's progress under the IDP. (Hunt Aff. ¶ 15; Flynt Aff. ¶ 15.) Although Cpl. Flynt, Plaintiff's direct supervisor, was out of the office and unable to attend on September 25, the meeting went forward with Dr. Hunt. (Hunt Aff. ¶ 15; Flynt Aff. ¶ 15.) In his affidavit, Dr. Hunt states that during the meeting on September 25, he and Plaintiff discussed specific goals which she had not met, including Goal 3 of the IDP, involving increasing her understanding and use of correct databases, and Goal 5, namely, to "timely complete[] weekly maps used during Tuesday morning meetings." (Hunt Aff. ¶ 15; see also Def.'s Br., Ex. 4 at 4.) Nevertheless, according to Dr. Hunt, he reinforced his desire for Plaintiff to become "a productive part of the team." (Hunt Aff. ¶ 15.) In his affidavit, Dr. Hunt states that at the request of the City's Human Resources Department, he reminded Plaintiff that she was still a probationary employee until October 15, 2013, and thus could be terminated during this period. (Id.) Plaintiff states that she viewed this statement as a threat from Dr. Hunt to terminate her. (McKee Aff. ¶¶ 8-9.)

On October 3, 2013, Plaintiff met with both Cpl. Flynt and Dr. Hunt to further discuss her IDP. (Hunt Aff. ¶ 16; Def.'s Br., Ex. 9; Pl.'s Br., Ex. 54 at 28.) As new supervisor of the CAU, Mr. Inscore observed this meeting. (Inscore Aff. ¶ 3.) According to the Memorandum provided to Plaintiff regarding that meeting, Cpl. Flynt and Dr. Hunt noted the areas in which she had achieved the goals set out in the IDP, but also addressed her failure to fully meet Goals 3 and 5. (Def.'s Br., Ex. 9 at 1; Pl.'s Br., Ex. 54 at 28; Flynt Aff. ¶ 16.) The Memorandum sets out specific examples that Cpl. Flynt and Dr. Hunt viewed as evidence of Plaintiff's failure

7

to understand and correctly use the relevant databases and prepare the appropriate reports, including incidents on August 1, 2013, August 12, 2013, August 23, 2013, September 9, 2013, and September 11, 2013. (Def.'s Br., Ex. 9 at 1-3; Pl.'s Br., Ex. 54 at 28-30.) According to the affidavits of Mr. Inscore, Dr. Hunt, and Cpl. Flynt, when asked to respond to these examples, Plaintiff stated, "No comment." (Inscore Aff. ¶ 3; Hunt Aff. ¶ 16; Flynt Aff. ¶ 19; Def.'s Br., Ex. 15 at 1.)

During the October 3 meeting, Plaintiff requested written verification of what her employment status would be as of October 15, the day her probationary employment term was scheduled to end. (Flynt Aff. ¶ 18; Def.'s Br., Ex. 9 at 3; Pl.'s Br., Ex. 54 at 30.) Plaintiff was provided with the Memorandum, noting that her IDP would continue and Plaintiff would be provided with additional training in an effort to further assist her in meeting her IDP goals, and that no decision had been made about her employment status. (Flynt Aff. ¶¶ 17-18; Def.'s Br., Ex. 9 at 3; Pl.'s Br., Ex. 54 at 30.)

According to the October 3 Memorandum, in order to assist her in achieving the goals, she would be paired with a more experienced analyst for one-on-one training over five business days during October 4, 2013 through October 10, 2013. (Def.'s Br., Ex. 9 at 3; Pl.'s Br., Ex. 54 at 30.) According to the Memorandum, Plaintiff requested a written list of tasks she would be required to complete during the one-on-one training. (Def.'s Br., Ex. 9 at 3-4; Pl.'s Br., Ex. 54 at 30-31; Hunt. Aff. ¶ 16.) However, the Memorandum notes that because the CAU's work changes on a daily basis, providing a detailed list of future assignments was not possible. (Def.'s Br., Ex. 9 at 4; Pl.'s Br., Ex. 54 at 31; Flynt Aff. ¶ 18.) Nevertheless, the

October 3 Memorandum included a short list of definite tasks that Plaintiff would be required to complete during the training. (Def.'s Br., Ex. 9 at 4; Pl.'s Br., Ex. 54 at 31.)

According to Mr. Inscore, Plaintiff initially refused to submit to the one-on-one training with crime analyst Gina Smith-Battle,[2] stating that she would not begin the training until she had a written verification of the tasks she would be required to complete. (Inscore Aff. ¶ 4.) Mr. Inscore met with Plaintiff to address her concerns about the training. (Id.) According to Mr. Inscore, Plaintiff expressed concern that without a measurable list of tasks, the training would be used as a justification to terminate her. (Id.) Mr. Inscore states that he told Plaintiff that this was not the purpose of the training, and further explained that the one-one-one training did not constitute a new IDP, but rather was part of a continuation of her earlier IDP. (Id.) Plaintiff then agreed to move forward with the training. (Id.)

According to Mr. Inscore, he observed certain deficiencies in Plaintiff's understanding of the work during her one-on-one training. (Id. ¶ 5.) However, Plaintiff reported that she understood how to correctly gather data. (Id.) According to Mr. Inscore, after the training on October 9 ended, Plaintiff indicated to Mr. Inscore that the training had been productive. (Id. ¶ 6.) However, the following day, Plaintiff stated that the training was "demeaning" and that she needed to speak with a Human Resources representative. (Id.) Dr. Hunt states that Plaintiff completed only two of the five scheduled days of training. (Hunt Aff. ¶ 17.)

On October 3 and October 10, immediately before and after the training period, Plaintiff filed formal complaints against Dr. Hunt and Cpl. Flynt with the City's Human

---

[2] Plaintiff's co-worker is inconsistently referred to in the Parties' filings as "Gina Smith-Battle" and "Gina Battles Smith." For purposes of this Recommendation, the Court will refer to her as "Gina Smith-Battle."

Resources Department. (Def.'s Br., Ex. 12.) Plaintiff's chief complaint was that the shortcomings noted in her September 25 and October 3 performance reviews were unjustified, and amounted to harassment. (Id. at 17, 24.) She stated that neither Dr. Hunt nor Cpl. Flynt provided "data or written information" supporting their determination that she had not met some of her IDP goals, and only noted two errors she had committed. (Id. at 17, 24.) Plaintiff further noted her view that her IDP constituted a "continuation of the harassment and hostile environment in which [she] works." (Id. at 24.) Additionally, Plaintiff complained that she was not receiving sufficient training. (Id. at 17.) Plaintiff also reported that all white analysts in the CAU were allowed to wear headphones, while she was not permitted to do so. (Id.; McKee Aff. ¶ 10.) After conducting an investigation, which included interviews with Plaintiff, her co-workers, and her supervisors, the Employment Relations Division found that Plaintiff's allegations of Hostile Work Environment were unsubstantiated, and recommended continuation of the IDP to address Plaintiff's performance issues. (Def.'s Br., Ex. 12 at 6.) However, Plaintiff contends that her complaint was not taken seriously or adequately investigated, particularly in light of the fact that a Human Relations Department representative subsequently informed Plaintiff that her complaint about headphone use was not investigated. (McKee Aff. ¶ 8-10.)

On October 14, Mr. Inscore and Dr. Hunt extended Plaintiff's probationary employment period for an additional ninety days, through January 15, 2014. (Def.'s Br., Ex. 11; Pl.'s Br., Ex. 54 at 21; Inscore Aff. ¶ 8; Hunt Aff. ¶ 17.) According to Dr. Hunt, this second extension of her probationary period was designed to allow Plaintiff additional time to meet the IDP goals, and to evaluate whether one-on-one training improved her performance.

(Hunt Aff. ¶ 17; Def.'s Br., Ex. 11; Pl.'s Br., Ex. 54 at 21.) Mr. Inscore states in his affidavit that he personally worked with Plaintiff on her data retrieval skills on October 14 and 15, and that during these sessions, he observed several deficiencies in Plaintiff's understanding of the process. (Inscore Aff. ¶ 7; see also Def.'s Br., Ex. 15 at 6-7.) Further, on October 15, Plaintiff copied Mr. Inscore on an email which, in his view, "shed some light on her lack of understanding of where data is coming from . . . ." (Def.'s Br., Ex. 15 at 7; see also Inscore Aff. ¶ 7.) Mr. Inscore states that after receiving additional reports of errors in Plaintiff's data, he again coached Plaintiff in areas where she lacked proficiency. (Inscore Aff. ¶ 10.) On November 4, 2013, Mr. Inscore and Dr. Hunt, with Plaintiff's input, revised her IDP and, among other additions, included a sixth goal related to Plaintiff's efficiency, organization, and time management skills. (Def.'s Br., Ex. 13 at 5; Hunt Aff. ¶ 18; Inscore Aff. ¶ 11.) The revised IDP covered the timeframe between November 4, 2013, and January 6, 2014. (Def.'s Br., Ex. 13.)

According to Mr. Inscore, he met with Plaintiff periodically during the revised IDP period to discuss her progress. (Id. ¶ 12.) Mr. Inscore's meeting notes from November 26, 2013, December 18, 2013, and January 8, 2014 reflect continued problems in Plaintiff's performance. (Def.'s Br., Ex. 16.) In particular, Mr. Inscore noted that Plaintiff continued to make errors on routine assignments and failed to timely complete her work. (Id. at 3, 8-9; Inscore Aff. ¶ 12.) In his affidavit, Mr. Inscore summarizes Plaintiff's job performance as follows:

> [Plaintiff's] level of productivity was approximately one-third of the productivity of the other analysts in the department, including the analyst which was hired at the same time she was. Her work required extensive review by supervisors for data accuracy and consistency. She often did not follow

11

established formats. This level of supervision was not required for the other analysts in the CAU. Her work was returned to her for multiple revisions before it was in shape to distribute to the end users. She was able only to do basic assignments by following step-by-step written instructions, but she did not appear to be willing to learn more advanced processes and methods. She had many problems in validating data derived from multiple sources.

(Inscore Aff. ¶ 14.)

On or about December 3, 2013, Plaintiff filed a charge of discrimination against the City with the U.S. Equal Employment Opportunity Commission ("EEOC").

On January 6, 2014, Mr. Inscore and Dr. Hunt met to discuss Plaintiff's employment status. (Inscore Aff. ¶ 14.) According to Mr. Inscore, based on his concerns, he and Dr. Hunt decided to recommend to GPD Deputy Chief Joe Smith that Plaintiff's probationary period of employment not be further extended, and that she be terminated. (Id.; Hunt Aff. ¶ 19.) On January 6, Dr. Hunt sent a memorandum and recommendation to Chief of Police Ken Miller, noting that "[t]o date, [Plaintiff's] level of efficiency, accuracy of analysis, and understanding of police data is insufficient to meet the requirements of the position for which she was hired." (Def.'s Br., Ex. 17 at 1; Pl.'s Resp., Ex. 36 at 1.) Deputy Chief Smith concurred with the recommendation that Plaintiff be terminated. (Def.'s Br., Ex. 18.) Chief Miller approved the decision to terminate Plaintiff, and on January 10, 2014, Mr. Inscore and Deputy Chief Smith met with Plaintiff to inform her that her employment would not be extended beyond the probationary period. (Inscore Aff. ¶ 15.)

Now, in the instant action, Plaintiff brings claims pursuant to Title VII alleging racial discrimination, racially hostile work environment, and retaliation. Defendant has filed a Motion for Summary Judgment, contending that there are no genuine issues of material fact and that Plaintiff's claims are without evidentiary basis and should be dismissed.

## II. STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Id. at 255. A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in the light most favorable to the non-moving party. Id. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick Cty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48). A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994); see also Anderson, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials.)

## III. DISCUSSION

Pursuant to Title VII, Plaintiff claims that Defendant discriminated against her because of her race, subjected her to a racially hostile work environment, and retaliated against her by terminating her employment after she engaged in protected activity. In its instant Motion,

13

Defendant contends that it is entitled to summary judgment on all of Plaintiff's claims. (Def.'s Mot. [Doc. #28].) The Court will address each of Plaintiff's claims in turn.[3]

## A. Disparate Treatment

Title VII's antidiscrimination provision makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer will be held liable under this provision if "a protected characteristic [is] a 'motivating factor' in an employment decision." E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 135 S. Ct. 2028, 2032 (2015) (quoting 42 U.S.C. § 2000e-2(m)). To defeat a motion for summary judgment on a racial discrimination claim, a plaintiff can present direct or circumstantial evidence creating a genuine issue of material fact as to whether race motivated the employer's adverse employment action or, alternatively, can proceed under the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973). Stewart v. Morgan State Univ., 606 F. App'x 48, 49 (4th Cir. 2015); see also Tabor v. Freightliner of Cleveland, LLC, 388 F. App'x 321, 322 (4th Cir. 2010); Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). Here, Plaintiff has presented no direct

---

[3] The Court notes that Plaintiff has filed a Surreply [Doc. #38]. "Though the Local Rules do not expressly prohibit surreplies, a surreply is not generally allowed under this district's Local Rules. Generally, courts allow a party to file a surreply only when fairness dictates based on new arguments raised in the previous reply." Pathfinder Software, LLC v. Core Cashless, LLC, No. 1:14-CV-633, 2015 WL 5093284, at *2 (M.D.N.C. Aug. 28, 2015) (internal citation, quotations, and alteration omitted). Here, it appears that Plaintiff's Surreply is improper, as Defendant raised no new arguments in its Reply brief. However, the Court need not resolve this issue, as consideration of Plaintiff's Surreply would not alter the Court's Recommendation.

or circumstantial evidence of racial discrimination, and the Court will therefore presume she intends to proceed under the burden-shifting framework.

Under the McDonnell Douglas framework, a plaintiff must establish "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) aff'd sub nom. Coleman v. Court of Appeals of Maryland, 132 S. Ct. 1327 (2012); see also Kelley v. United Parcel Serv., Inc., 528 F. App'x 285, 286 (4th Cir. 2013). If a plaintiff can make this showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. If the employer meets its burden, a plaintiff then has the opportunity to establish that the employer's articulated reason is pretextual. Id. at 804.

In the case at hand, Plaintiff argues that because of her race, Defendant criticized her work performance in evaluations, placed her on an IDP, and ultimately terminated her employment. (Pl.'s Resp. [Doc. #35].) However, based on the evidence before the Court, Plaintiff has failed to establish a prima facie case of discrimination. In particular, it does not appear that Plaintiff has made a prime facie showing that she was performing her job satisfactorily. Although Plaintiff states that her work product was "excellent," (McKee Aff. ¶¶ 2, 7), a positive self-assessment does not establish a prima facie case of satisfactory job performance. See Jones v. Constellation Energy Projects & Servs. Grp., Inc., No. 15-1090, 2015 WL 6389167, at *2 (4th Cir. Oct. 22, 2015). Indeed, "whether an employee met his employer's legitimate expectations at the time of termination depends on the 'perception of

the decision maker . . . , not the self-assessment of the plaintiff.'" Id. (quoting Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000)). Here, the only additional admissible evidence Plaintiff puts forward in support of her position is her June 5, 2013 First Quarter Employment Review in which Dr. Hunt stated that "[n]o deficiencies have been noted at this time." (Pl.'s Resp., Ex. 23).[4] However, this evidence appears to fall short as well. In particular, this evaluation took place during the early stages of Plaintiff's employment with the City, and Plaintiff has proffered no evidence that she was meeting legitimate employment expectations after June 5, 2013, during the last seven months of her employment. Indeed, Plaintiff has submitted her termination letter which notes Plaintiff's performance issues beginning in July 2013 and continuing throughout her tenure with the City. (Pl.'s Resp., Ex. 36.)

Moreover, whether considered as part of Plaintiff's prima facie case or Defendant's proffer of a legitimate, non-discriminatory reason for its actions, Defendant has presented extensive undisputed evidence to establish that Plaintiff was terminated because of her job performance. (Def.'s Br. [Doc. #29] at 9.) Defendant's evidence includes detailed records outlining specific deficiencies in Plaintiff's job performance beginning shortly after she was

---

[4] The Court notes that in support of her position, Plaintiff has pointed to a decision of the North Carolina Employment Security Commission ("ESC") regarding Plaintiff's claim for unemployment benefits. (Pl.'s Resp., Ex. 38.) She has also attempted to attach as exhibits audio recordings of her hearing in front of the ESC. (Pl.'s Resp., Ex. 49 & 50.) However, under N.C. Gen. Stat. § 96-4(x)(8), this evidence "is not admissible or binding in any separate or subsequent action or proceeding, between a person and his present or previous employer brought before [a] . . . court or judge of . . . the United States, regardless of whether the prior action was between the same or related parties or involved the same facts." See Abdus-Salaam v. Bill Maddalon Unique S. Estates, No. 3:11CV410, 2012 WL 1569584, at *2 (W.D.N.C. May 3, 2012) (finding that "[a] determination by the [ESC] concerning a claim by the plaintiff for unemployment benefits is *inadmissible* in a Title VII proceeding." (emphasis in original)); Smith v. Comput. Task Grp., Inc., 568 F. Supp. 2d 603, 611 (M.D.N.C. 2008) (applying this state rule and finding inadmissible a prior ESC decision); Stroud v. Tyco Elecs., 438 F. Supp. 2d 597, 600 n.2 (M.D.N.C. 2006).

hired, and continuing throughout the entirety of her employment. In their affidavits, Dr. Hunt and Cpl. Flynt state that only a few months after Plaintiff and Mr. Sinykin were hired, Plaintiff's work was noticeably inferior to that of Mr. Sinykin. In Plaintiff's July 5, 2013 performance review, Cpl. Flynt noted Plaintiff's repeated mistakes related to using source data from the incorrect database and failure to timely complete assignments. (Def.'s Br., Ex. 2; Pl.'s Resp., Ex. 51.) Cpl. Flynt's Memorandum of the July 16, 2013 meeting with Plaintiff reflect that these concerns were communicated to Plaintiff. (Def.'s Br., Ex. 3; Pl.'s Resp., Ex. 54 at 7.) Plaintiff's first IDP reflects her performance issues, and sets forth the specific areas for improvement identified by Dr. Hunt and Cpl. Flynt. (Def.'s Br., Ex. 4; Pl.'s Resp., Ex. 54 at 23-27.) Further, Cpl. Flynt's Memorandum following an October 3, 2013 meeting with Plaintiff indicates that while Plaintiff achieved several of the goals under the IDP, she was still having problems with routine tasks such as accessing the right databases, data processing methods and procedures, and retrieving correct numbers. (Def.'s Br., Ex. 9; Pl.'s Br., Ex. 54 at 28.)

Defendant's evidence further reveals that Plaintiff's work performance issues continued after Mr. Inscore joined the CAU as supervisor. Throughout October 2013, Mr. Inscore noted several instances which demonstrated Plaintiff's lack of understanding regarding the use of correct data sources. (Def.'s Br., Ex. 15 at 6-9.) Plaintiff's November 4, 2013 revised IDP evidences this concern and others, including issues related to Plaintiff's efficiency and time management skills. (Def.'s Br., Ex. 13.) Further, Mr. Inscore's notes from November 2013 to January 2014 demonstrate that Plaintiff continued to exhibit deficiencies in data accuracy, efficiency, and time management. (Def.'s Br., Ex. 16.) The undisputed

record reveals that Plaintiff's supervisors submitted negative performance reviews, placed Plaintiff on an IDP, and ultimately terminated her employment because of her continued performance deficiencies.

Plaintiff has failed to put forth any evidence indicating that Defendant's proffered reason for its actions is pretextual. The record shows that Plaintiff's supervisors repeatedly attempted to provide her with opportunities to develop necessary skills. Indeed, instead of terminating Plaintiff in July 2013, Plaintiff's supervisors twice extended her probationary period in order to allow Plaintiff additional time to improve her work performance. Additionally, her supervisors organized intensive one-on-one training, set out specific performance goals in Plaintiff's IDP, and met with Plaintiff often to discuss her progress under the IDP.

In Plaintiff's opposition brief to Defendant's summary judgment motion, she has set forth numerous "disputable points" which she contends preclude summary judgment. (Pl.'s Resp. at 4-9.) "Disputable Points" 1, 5, 6, 7, and 8 all relate to Plaintiff's job performance. Plaintiff's position appears to be summarized in her statement that the quality of her work performance "is disputable because [she] disagrees." (Id. at 5). Plaintiff's subjective belief, however, is insufficient to create a triable issue of fact on this point. See Stewart v. Morgan State Univ., 606 F. App'x 48, 49 (4th Cir. 2015) (citing Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 135 (4th Cir. 2002) for the proposition that "subjective beliefs about discrimination are insufficient to create a genuine issue of material fact as to any discriminatory conduct on

[employer's] part" (internal quotation omitted)).[5]  Further, while Plaintiff maintains that Defendant has not provided proof of her unsatisfactory work performance, (Pl.'s Resp. at 7-8), the record indicates otherwise, and establishes that her supervisors repeatedly addressed specific errors found in her work.  Notably, at the October 3, 2013 meeting, Dr. Hunt and Cpl. Flynt confronted Plaintiff with multiple examples of errors in her work, to which she responded, "No comment."  Plaintiff now attempts to dispute whether or not some of the errors were correctly noted.  However,

> "'when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'" DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410–11 (7th Cir. 1997)); see also id. ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." (internal quotation marks and citations omitted)).

Allen v. Fed. Exp. Corp., No. 1:09CV17, 2011 WL 1260225, at *12 (M.D.N.C. Mar. 31, 2011. Here, Plaintiff has failed to produce any evidence from which a reasonable factfinder could conclude that Defendant's stated basis for her discharge was not, in fact, the reason she was fired.

Plaintiff also raises three other purported "Disputed Facts," denominated as Disputable Points 2, 3, and 4.  In Disputed Fact 2, Plaintiff contends that her probationary

---

[5] To the extent Plaintiff contends that Defendant failed to follow its internal policies in terminating her, such evidence does not create a triable issue of fact on whether Defendant's proffered reason for her termination was pretextual.  See Corbell v. City of Holly Hill, No. 5:13-CV-00324-JMC, 2014 WL 4722194, at *8 (D.S.C. Sept. 22, 2014) (collecting cases and stating that "while [Plaintiff] asserts that the defendant's proffered reasons for discharge are false and pretextual based on the defendant's alleged failure to follow its own policies during the termination, courts have generally recognized that an employer's unfair deviation from its own termination procedures . . . is not probative of discriminatory intent and cannot show pretext.").

period should have ended after 90 days, in May 2013, prior to the July 2013 review indicating marginal performance. However, even if that is true, the question of whether she was still on her initial probationary period would not be material to her claim of race discrimination in violation of Title VII. It is undisputed that Plaintiff and Mr. Simykin were initially placed on the same probationary status, and regardless of the length of the initial probationary period, it is undisputed that during the period from July 2013 through January 2014, Plaintiff was subject to additional evaluations, an either extended or renewed probationary period, and an IDP, based on the evaluations included in the record. To the extent that Plaintiff contends that Defendant somehow failed to follow its own procedures, those contentions would not create an issue of material fact with respect to her claim of race discrimination. Similarly, in Disputed Fact 3, Plaintiff contends that she and Dr. Hunt were professional acquaintances prior to her employment with GPD, and that she had met him more than the two times reflected in Dr. Hunt's affidavit. However, this issue is not material to her claim of race discrimination. As part of this Disputed Fact, Plaintiff claims that Dr. Hunt made "disparaging remarks" by telling her during an evaluation in September 2013 that she "looked good on paper" and "answered the interview questions correctly" but that she "didn't know anything" and "can't do any analytical work." Again, even if true, these remarks are consistent with Defendant's evaluation of Plaintiff's work and would not reflect evidence of racial discrimination. Finally, in Disputed Fact 4, Plaintiff contends that there is an issue of disputed fact regarding whether she was allowed to wear headphones in the office. However, even if the Court accepts Plaintiff's contentions that she was prohibited from wearing headphones, the fact that she was not allowed to wear headphones after the July 2013 performance review, which advised her to

"interact more" with colleagues, is not a basis for finding race discrimination.[6] Ultimately, based on the evidence before the Court, no genuine issue of material fact exists with respect to Plaintiff's claims that her race played a role in her negative performance reviews, placement on an IDP, and ultimate termination.[7]

To the extent Plaintiff may also be claiming that Defendant failed to hire her for the CAU supervisor position because of her race, such claim likewise should not survive summary judgment. Under McDonnell Douglas, to establish a prima facie case of discrimination for failure to hire, Plaintiff must show, among other things, that "'she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination.'" Ferdinand-Davenport v. Children's Guild, 742 F. Supp. 2d 772, 780 (D. Md. 2010) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959–60 (4th Cir.1996)). In this case, it appears that such circumstances are absent. Plaintiff points to no evidence giving rise to an inference that the interview panel considered Plaintiff's race in making its hiring decision. Moreover, in any event, Defendant has proffered a legitimate, non-discriminatory reason for hiring Mr. Inscore, which Plaintiff has not rebutted. Defendant states that Mr. Inscore was better

---

[6] Moreover, a prohibition on wearing headphones would not be an adverse employment action. "An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) (quoting James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir.2004)).

[7] The Court additionally notes that Dr. Hunt, who served on the panel that hired Plaintiff, made the recommendation with Mr. Inscore to fire Plaintiff. Dr. Hunt had met Plaintiff before they began working together at the City (Hunt Aff. ¶ 2), and thus was necessarily aware of Plaintiff's race before hiring her. Further, he had previously provided a recommendation for Plaintiff as part of her application to a Ph.D. program. (Pl.'s Resp., Ex. 39.) These circumstances create a "strong inference" that Dr. Hunt did not consider Plaintiff's race when completing performance evaluations or making the decision to recommend Plaintiff's termination. Adjabeng v. GlaxoSmithKline, LLC, No. 1:12-CV-568, 2014 WL 10077476, at *9 (M.D.N.C. Jan. 23, 2014) (citing Proud v. Stone, 945 F.2d 796, 797-98 (4th Cir. 1991)).

qualified for the job. (Def.'s Br. at 13.) The record indicates that Plaintiff was one of twenty applicants for the supervisor position, and was one of six finalists selected for an in-person interview. Dr. Hunt, one of Plaintiff's supervisors in the CAU, was part of the hiring committee that selected Plaintiff as a finalist. Following in-person interviews by a panel comprised of one white male (Dr. Hunt), one white female, and two black males, uncontroverted evidence shows that "[t]he six candidates were rated in areas related to technical skills, Policing and Police Models, Crime Analysis, supervisory experience and knowledge, and professional presentation and interaction." (Def.'s Br., Ex. 7.) Defendant states that based on these factors, Mr. Inscore received the highest rating and was offered the position. Plaintiff has presented no evidence that Defendant's stated hiring criteria was pretext for racial discrimination. Accordingly, to the extent Plaintiff claims she was not selected for the supervisor position because of her race, such claim should not survive Defendant's summary judgment motion.

In sum, viewing the evidence in the light most favorable to Plaintiff, there is insufficient evidence to create a genuine issue of material fact on Plaintiff's claim that Defendant terminated her employment or otherwise took an adverse employment action against her because of her race. Accordingly, the Court will recommend that summary judgment be granted in favor of Defendant on Plaintiff's disparate treatment claims.

### B. Hostile Work Environment

Title VII's anti-discrimination provision also prohibits employers from subjecting employees to racially-hostile work environments. See Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 276-77 (4th Cir. 2015). As articulated by the Fourth Circuit:

A hostile environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted). Thus, to prevail on a Title VII claim that a workplace is racially hostile, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's ... race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Okoli v. City of Balt.,* 648 F.3d 216, 220 (4th Cir.2011) (alteration and internal quotation marks omitted).

Boyer-Liberto, 786 F.3d at 277.

Although not immediately evident from Plaintiff's Amended Complaint and summary judgment briefing, it appears Plaintiff's hostile work environment claim is based on alleged harassment by her supervisors. (See Pl.'s Resp. [Doc. #35] at 4-5.) Specifically, Plaintiff believes that her negative performance evaluations and placement on an IDP amount to unlawful racial harassment. (Id.) Further, Plaintiff states that Dr. Hunt's negative comments made directly to Plaintiff about her substandard job performance were demoralizing, verbally hostile, and intimidating, (id. at 6-7), and that his threat to terminate her amounted to harassment, (McKee Aff. ¶ 8).

The Court notes that Plaintiff's hostile work environment claim is based in large part on the allegations underlying her disparate treatment claim discussed above, and thus fails for similar reasons. See Miller v. Ethan Allen Glob., Inc., Civil No. 3:10-CV-1701 JCH, 2011 WL 3704806, at *7 (D. Conn. Aug. 23, 2011) (dismissing hostile work environment claim based on same facts as untenable disparate treatment claim). Namely, Plaintiff has put forth no evidence that the alleged harassment was motivated by her race.

Moreover, this is not the type of "severe and pervasive" harassment that a Title VII hostile work environment claim is designed to address. Rather, in order "for harassment to be sufficiently severe or pervasive, the workplace must be 'permeated with discriminatory intimidation, ridicule, and insult.'" Burgess v. Howard Cty. Police Dep't, Civil No. CCB-12-3590, 2013 WL 5442420, at *5 (D. Md. Sept. 30, 2013) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Negative performance reviews are "personnel decisions [which] do not rise to the level of a hostile work environment." Id.

For these reasons, Plaintiff has failed to present evidence creating a genuine issue of material fact on her hostile work environment claim, and the Court will recommend that summary judgment be granted in favor of Defendant on this claim.

C. Retaliation

Title VII's anti-retaliation provision imposes liability on an employer that discriminates against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); see also Coleman, 626 F.3d at 190. Like a Title VII disparate treatment claim, a plaintiff may establish a Title VII retaliation claim by presenting direct or circumstantial evidence of retaliation or, alternatively, by proceeding under the McDonnell Douglas framework. See Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015). To establish a prima facie case of retaliation under McDonnell Douglas, the plaintiff must demonstrate: (1) engagement in a protected activity; (2) adverse employment action; and (3) a

causal link between the protected activity and the employment action. Id. at 253.[8] The burden then shifts to the defendant to show a legitimate, non-retaliatory reason for taking the alleged retaliatory action. Id. at 250. Thereafter, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's proffered reason is pretext for retaliatory discrimination. Id.

In the instant case, Plaintiff contends that Defendant retaliated against her by criticizing her work product, placing her on an IDP, and eventually terminating her. It is undisputed that Plaintiff filed internal claims of discrimination with the City's Human Resources Department in early October 2013, approximately three months before she was terminated, and with the EEOC on December 3, 2013, approximately one month prior to her termination.[9] Accordingly, the only element at issue with respect to Plaintiff's prima facie case is the causal link between Plaintiff's protected activity and termination. See Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 258 (4th Cir. 1998); Bickford v. Denmark Tech. Coll., 479 F. Supp. 2d 551, 568 (D.S.C. 2007).

Plaintiff's burden of establishing causation at the prima facie stage is not onerous. See Foster, 787 F.3d at 251; Johnson v. Lemonds, No. 1:15CV410, 2016 WL 447494, at *5 (M.D.N.C. Feb. 4, 2016) (citing Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.

---

[8] The Court notes that in Univ. of Texas Southwestern Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013), the Supreme Court held that to establish a retaliation claim under Title VII, a plaintiff must prove that retaliatory animus was the but-for cause of the alleged adverse action. In Foster, the Fourth Circuit continued to apply the McDonnell Douglas framework in evaluating retaliation claims at the summary judgment stage, even after Nassar. 787 F.3d at 250-52.

[9] To the extent Plaintiff claims Defendant retaliated against her for submitting an application for the CAU supervisor position, such claim is untenable, as applying for a position is not protected activity under Title VII. See 42 U.S.C. § 2000e-3(a).

1989)). Indeed, the Fourth Circuit has held that proof that a plaintiff "was fired after her employer became aware that she had filed a discrimination charge . . . certainly satisfies the less onerous burden of making a prima facie case of causality." Williams, 871 F.2d at 457; see also Foust v. S. E. Express, Inc., No. 1:00CV01147, 2002 WL 732161, at *3 (M.D.N.C. Feb. 19, 2002) (noting that "close temporal proximity can provide sufficient causation to satisfy the third prong of the prima facie case.")

Here, Plaintiff filed her internal discrimination claims and her EEOC claim approximately three months and one month, respectively, before she was terminated. Dr. Hunt was aware that Plaintiff had filed internal discrimination charges against him. (Hunt Aff. ¶ 21.) In the circumstances, the Court will assume that Plaintiff has met the low burden of establishing causation at the prima facie stage. However, even if Plaintiff could establish a prima facie case, Defendant has rebutted Plaintiff's prima facie case of retaliation by articulating a legitimate, non-retaliatory reason for terminating Plaintiff. As the Court previously described, Defendant has produced records detailing Plaintiff's unsatisfactory job performance, and contends this was the reason for Plaintiff's termination.

In response, Plaintiff has produced no evidence that Defendant's articulated reason is pretext for retaliation. The record reveals that Cpl. Flynt and Dr. Hunt first documented Plaintiff's performance deficiencies in July 2013, almost three full months before Plaintiff filed her first internal discrimination claim in October 2013. There is no evidence that Cpl. Flynt or Dr. Hunt increased their scrutiny of Plaintiff's work or otherwise began to unfairly criticize Plaintiff's performance after she filed discrimination claims. Rather, Plaintiff's negative performance reviews following the filing of her discrimination charges reflect a continuation

of her prior, well-documented weaknesses. Further, after Plaintiff filed discrimination claims, evidence shows that Plaintiff's supervisors twice extended her probationary employment period and modified her IDP in an effort to allow Plaintiff additional time to demonstrate her ability to fulfill the required job functions.

In sum, Plaintiff has presented no evidence which calls into question Defendant's assertion that it fired Plaintiff because of her failure to meet the job requirements of a crime analyst. In the circumstances, no reasonable juror could conclude that Defendant fired Plaintiff because she filed claims of discrimination. Accordingly, the Court will recommend that summary judgment be entered in favor of Defendant on Plaintiff's retaliation claim.

IV. CONCLUSION

Based on the foregoing, Plaintiff has failed to demonstrate the existence of any genuine issue of material fact with respect to her Title VII claims for disparate treatment, hostile work environment, and retaliation. Therefore, the Court will recommend that Defendants' Motion for Summary Judgment be granted, and that this action be dismissed.

In light of this determination, the Court will Order that the parties stand down from trial preparation. The trial date and pre-trial deadlines will be continued and will be re-set as needed after the District Judge's consideration of this Recommendation and any objections thereto.

IT IS THEREFORE RECOMMENDED that Defendant's Motion for Summary Judgment [Doc. #28] be GRANTED, and that this action be dismissed with prejudice.

IT IS ORDERED that in light of this determination, the parties stand down from trial preparation, and the trial date and pre-trial deadlines are CONTINUED and will be re-set as

needed after the District Judge's consideration of this Recommendation and any objections thereto.

This, the 7th day of March, 2016.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge
